IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| THE CINCINNATI INSURANCE COMPANY, | * | |
| Plaintiff/Counter-Defendant, | * | |
| v. | * | Civil Action No. RDB-19-3355 |
| JOSEPH FISH, | * | |
| Defendant/Counter-Plaintiff. | * | |

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

**MEMORANDUM OPINION**

This case arises out of hull damage to a 48-foot ocean yacht owned by Joseph Fish ("Fish") and insured by the Cincinnati Insurance Company ("Cincinnati"). Fish's yacht sustained the damage in a storm while it was docked at a marina in Kent Island, Maryland on July 23, 2017. (Compl., ECF No.1 ¶ 9.) On November 21, 2019, after having already issued a payment to Fish one year earlier, Cincinnati filed this one-count declaratory judgment action pursuant to 28 U.S.C. §§ 1333 and 2201 to determine any further monetary liability under the policy issued to Fish. (Compl., ECF No. 1.) Four days later, Fish filed a nine-count complaint against Cincinnati and another defendant, HMS Insurance Associates, Inc. ("HMS"), in the Circuit Court for Baltimore City, Maryland, alleging one declaratory judgment count and seven insurance-related counts against Cincinnati and one count of negligence against HMS. *See Joseph Fish v. The Cincinnati Insurance Co. et al.*, Civil Action No. RDB-20-0018. That original state action was then removed to this Court on January 3, 2020. *Id.* On April 2, 2020, this Court denied Fish's motion to remand that case because

1

Defendant HMS had been fraudulently joined as Fish had not demonstrated any right to relief against HMS, the marine insurance broker. *Id.*, Memorandum Order, ECF No. 18 (D. Md. Apr. 2, 2020). In addition, this Court dismissed defendant HMS from that action for Fish's failure to state the sole negligence claim asserted against HMS. *Id.* On April 3, 2020, this Court entered an Order consolidating for all purposes this case with the removed state court action. (Order, ECF No. 15.)

On July 23, 2021, Fish filed an Amended Counterclaim alleging several causes of action against Cincinnati. (Answer and Amended Counterclaim, ECF No. 69.) Specifically, Fish brings his own declaratory judgment action (Count One). He also raises claims against Cincinnati for breach of contract (Count Two); first-party lack of good faith in violation of Md. Code Ann., Cts. & Jud. Proc. § 3-1701 and Md. Code Ann., Ins. § 27-1001 (Count Three); unfair claim settlement practices in violation of Md. Code Ann., Ins. §§ 27-301 *et seq.* (Counts Four, Six, Seven, and Eight); and breach of the implied covenant of good faith and fair dealing (Count Eight*).[1] Presently pending are the parties' cross motions for summary judgment (Cincinnati Motion, ECF No.80; Fish Opp. and Cross Motion, ECF No. 82.) The parties submissions have been reviewed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons that follow, Cincinnati's Partial Motion for Summary Judgment (ECF No. 80) as to Fish's Amended Counterclaim is GRANTED with respect to Counts Three through Eight*. Fish's Cross Motion for Summary Judgment (ECF No. 82) is

---

[1] Fish's Amended Counterclaim does not contain a Count Five and contains two counts that are labeled as Count Eight. For that reason, the second Count Eight will be identified as Count Eight*.

DENIED. Accordingly, this case shall proceed as to Cincinnati's claim for declaratory judgment and Fish's amended counterclaim for declaratory judgment and breach of contract.

BACKGROUND

## I.    The Policy

At all times relevant to this case, Joseph Fish maintained an all-risk Personal Watercraft Insurance Policy with the Cincinnati Insurance Company bearing policy number W01 0782932 (the "Policy"). The Policy insures a 2000 48' Ocean Yacht SS (the "Boat") with a policy limit in the amount of $215,000 less a $4,300 deductible. The Policy provides in relevant part as follows:

### PERILS INSURED

"We" will pay for:

a) All risks of physical loss to the property insured except that which is excluded;
b) Loss to the property insured caused by any latent defect in the hull or machinery excluding the cost of repairing or replacing any defective part.

(Personal Watercraft Policy, ECF No. 80-5 at 10.)

The policy continues:

### EXCLUSIONS

We will not pay for loss resulting directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss:

a) Wear and tear, inherent vice, deterioration, marine life, vermin, ice or freezing, electrolytic action, mechanical breakdown, dampness, corrosion, marring, denting, or extreme of temperature

(*Id.*) The policy further provides:

### SECTION V – DUTIES AFTER A LOSS

In the event of any loss, damage, or "occurrence" that is covered by this policy, any person presenting a claim must:

. . .

**PROTECT AND RECOVER**

Protect the insured property from further loss. Make every effort to recover it. Any steps "you" so take will not mean "you" are waiving any right "you" have to abandon the property. "We" will pay the reasonable costs incurred not exceeding the Limit of Insurance stated in Section I on the Declarations Page.

**COOPERATE WITH US**

Cooperate with "us" in all ways in the investigation, defense, and settlement of any loss; submit to examination under oath if "we" request.

(*Id.* at 14.)

## II.    Fish's Claim

On July 24, 2017, Fish informed Cincinnati that on the day prior while the Boat was moored in Kent Island, Maryland, it sustained damage to its hull during a powerful storm. (Claim Log Notes, ECF No. 80-6 at 3.) Fish also reported that the Boat had been taking on water. (*Id.*) On July 25, 2017, Cincinnati claim representative Dan Lambrecht spoke with Fish by telephone. (*Id.*) Fish reported that he would take the Boat to a shipyard to be inspected. (*Id.*) Lambrecht memorialized the telephone conversation in an email dated July 26, 2017. (ECF No. 80-7.) On July 28, 2017, Fish wrote to Lambrecht and indicted that the storm had caused damage to the Boat's electrical system. (ECF No. 82-2.) Lambrecht heard nothing from Fish for several weeks. Throughout August and September 2017, Lambrecht called and emailed Fish to request information regarding the claim. (ECF No. 80-6 at 4-5.) Fish eventually responded by telephone on October 11, 2017 and informed Lambrecht that he had not yet had a chance to take the Boat in for inspection because he had been using it for the rest of that summer. (*Id.* at 5.) Fish indicated that he would get the Boat to a shipyard within a few weeks. (*Id.*) Lambrecht continued to call and email Fish to obtain the

information necessary to adjust his claim. (*Id.* at 5-7.) On June 26, 2018, eleven months after the storm, Lambrecht sent Fish a letter informing him that if he did not contact Cincinnati regarding his claim within 30 days, Cincinnati would close its file. (June 26, 2018 Letter, ECF No. 80-9.)

One month later, on July 27, 2018 (one year after the storm), Fish responded to Lambrecht by email and stated that he did intend to present a claim for damage to the Boat and that he would be arranging to have the Boat inspected by the company Jarrett Bay, which operates a yacht yard in North Carolina. (July 27, 2018 Email, ECF No. 80-10.) Fish called Lambrecht on August 14, 2018 to inform him that an inspection had been scheduled for August 24, 2018. (ECF No. 80-6 at 8.) On August 24, 2018, Fish called Lambrecht to report that the inspection had been conducted the week prior and that he should have an estimate for repairs by the following week. (*Id.* at 8-9.)  On September 12, 2018, having received no estimate, Lambrecht again wrote to Fish requesting an update. (Sept. 12, 2018 Letter, ECF No. 80-11.)

On October 18, 2018, Fish forwarded an estimate prepared by Jarrett Bay Boat Works dated August 23, 2018. (ECF No. 80-6 at 10; Jarrett Bay Estimate, ECF No. 80-12.) The Jarrett Bay Estimate totaled more than $220,000, an amount that exceeded the $215,000 policy limit. (ECF No. 80-12; ECF No. 80-5 at 2.)

On October 24, 2018, Cincinnati retained Davis Company Limited, Marine Surveyors and Consultants ("Davis") to investigate the cause and scope of damage to the Boat. (ECF No. 80-6 at 11.) Douglas McDaniel of Davis reviewed Jarrett Bay's Estimate and as well as photos of the damage and then inspected the Boat on November 1, 2018. (McDaniel

Report, ECF No. 80-14.) At the inspection, Fish reported exterior damage and interior mold and water damage resulting from the July 2017 storm. (*Id.* at 1.) McDaniel noted that "[n]o other damages were reported by Mr. Fish at the time of [McDaniel's] inspection." (*Id.*). At the inspection, McDaniel observed damage to the exterior of the Boat. (*Id.* at 2.) McDaniel also observed interior water damage and mold under the areas of the side windows, on the wood side panels, the carpet on the port side, and under the port settee in the salon. (*Id.*) Following his inspection, McDaniel concluded that the Boat's exterior damage was consistent with "with being struck by hail and/or falling/flying debris" but that the water and mold damage was "consistent with a lack of maintenance over time." (*Id.*) McDaniel found the value of damages in the Jarrett Bay Estimate "to be unreasonable and beyond the scope of damages found during our inspection. [Jarrett Bay's] supplied estimate already easily exceeds the fair market value of the vessel prior to the loss of $208,900.00." (*Id.* at 3.) For the Boat's exterior damage, McDaniel calculated the loss at $22,925.00, minus the $4,300 deductible, for a net loss of $18,625.00. (*Id.*) McDaniel calculated the loss due to any interior water or mold damage to be $36,375.00. (*Id.*)

On November 17, 2018, Cincinnati issued a payment to Fish in the amount of $18,625.00, its determination of the value of the Boat's exterior damage resulting from the July 2017 storm - less Fish's deductible. (Nov. 17, 2018 Letter, ECF No. 80-18.) Cincinnati denied the claim as to the interior mold and water damage. (*Id.*) On March 29, 2019, Cincinnati received a letter from Fish informing Cincinnati that the Boat was going to be moved from its berth in Hampton, Virginia, and inviting Cincinnati to a joint inspection before repairs commenced. (March 29, 2019 Letter, ECF No. 80-19.) Treating that invitation

as a request for reconsideration of coverage to be provided, Cincinnati participated in the joint inspection under a full reservation of rights. On April 16, 2019, Fish and his marine consultant Michael McCook along with Cincinnati representatives and experts conducted a joint inspection in Hampton, Virginia. (June 6, 2019 McDaniel Report, ECF No. 80-20.). At the April 2019 inspection, McDaniel observed the same damage he reported during his initial inspection on November 1, 2018 and did not see evidence that any repairs had been undertaken. (*Id.* at 1.) Fish's consultant McCook suggested that the interior water damage was not actually attributable to water coming through the Boat's windows but was instead caused by a leaking wire chase running from the flybridge controls to the engine space. (Barry Letter, ECF No. 80-21.) Cincinnati's experts considered McCook's suggestion that a water leak was attributable to a leak in electrical conduit and determined that any such leak would not necessarily involve storm damage. (*Id.* at 3.) McCook indicated that a follow-up inspection of the electrical items would be necessary. (April 19, 2019 Letter, ECF No. 80-23.)

After further communication between the parties, the electrical inspection was scheduled for May 22, 2019. (May 14, 2019 Letter, ECF No. 80-27.) Engineer Michael Pinion and electrician Stephen Palmer attended the inspection on behalf of Cincinnati. (Pinion Report, ECF Np. 80-29.) By letter of November 21, 2019, Cincinnati re-affirmed its coverage of the prior year. (Nov. 21, 2019 Letter, ECF No. 80-30.) Specifically, Cincinnati maintained its position that the loss due to interior water and mold damage was excluded under the policy. (*Id.*) The parties later submitted the valuation dispute for the undisputed exterior portion of the covered loss for appraisal. (ECF No. 80-30 at 12; July 25, 2020

Appraisal Report, ECF No. 80-31.) At appraisal, the parties' representatives and a third-party umpire mutually agreed that Cincinnati would make an additional $24,652.00 in payments for the undisputed covered portion of the loss relating to exterior damage. In total, Cincinnati has paid Fish $47,777.00, less Fish's deductible, for his claim. (ECF No. 80-31.)

## III.   Procedural History

On May 9, 2019, Fish filed a complaint against Cincinnati with the Maryland Insurance Administration alleging that Cincinnati had breached its contract with Fish and that Cincinnati failed to act in good faith in adjusting his claim ("MIA"). (MIA Complaint, ECF No. 82-7.) On July 3, 2019, the MIA issued an opinion finding that Fish had not met his burden to show by a preponderance of the evidence that Cincinnati had failed to pay the full value of his claim or that Cincinnati failed to act in good faith in processing his claim. (MIA Opinion, ECF No. 80-32.) On July 15, 2019, Fish timely appealed the decision of the MIA to the Office of Administrative Hearings ("OAH").[2] (Request for Hearing, ECF No. 82-8.)

On November 21, 2019, Cincinnati filed suit in this Court seeking declaratory relief against Fish. (Compl., ECF No. 1.) The following day, on November 22, 2019, Fish withdrew his appeal to the Office of Administrative Hearings. (Withdrawal of Appeal, ECF No. 82-9.) On November 25, 2019, he filed suit against Cincinnati and HMS Insurance Associates, Inc. in the Circuit Court for Baltimore City, Maryland.[3] *See* Case No. 24-C-19-

---

[2] Pursuant to Md. Code Ann., Ins. § 27-1001(f), "if a party receives an adverse decision [from the MIA], the party shall have 30 days after the date of service of the Administration's decision to request a hearing . . . all hearings requested under this section shall be referred to the Commissioner to the Office of Administrative Hearings."

[3] HMS served as Fish's marine insurance broker. (RDB-20-018, Memorandum Opinion, ECF No. 18 at 2.)

006177. On January 3, 2020, Cincinnati removed the state case to this Court on the basis of diversity of citizenship jurisdiction under 28 U.S.C. § 1332 and federal question jurisdiction under 28 U.S.C. § 1331.[4] Notice of Removal, *Fish v. Cincinnati Insurance Company*, RDB-20-0018 (D. Md. Jan. 3, 2020), ECF No. 1. On April, 2, 2020, this Court denied Fish's motion to remand on the grounds that Fish had fraudulently joined HMS as a defendant. (RDB-20-0018, ECF No. 18.) This Court also dismissed HMS from that action. (*Id.*) On April 3, 2020, this Court also denied Fish's motion to dismiss this case. (Memorandum Opinion, ECF No. 14.) That same day, this Court entered an Order consolidating the removed state case and this case for all purposes. (ECF No. 15.)

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. Trial

---

[4] Cincinnati alleged that Defendant HMS, Fish's insurance broker and a citizen of Maryland like Fish, had been fraudulently joined to defeat this Court's diversity jurisdiction. (RDB-20-0018, ECF No 1 ¶ 7.)

courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). This Court "must not weigh evidence or make credibility determinations." *Foster v. University of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs*, 780 F.3d at 569 (explaining that the trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866-68 (2014).

When both parties file motions for summary judgment, as here, this Court applies the same standard of review to both motions, considering "'each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Defenders of Wildlife v. North Carolina Dept. of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (quoting *Bacon v. City of Richmond, Va.*, 475 F.3d 633, 638 (4th Cir. 2007)). "[B]y the filing of a motion [for summary judgment,] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the

event his adversary's theory is adopted." *Brown v. Perez*, 835 F.3d 1223, 1230 n.3 (10th Cir. 2016) (citation omitted); *see also Sherwood v. Washington Post, 871 F.2d 1144, 1148 n.4* (D.C. Cir. 1989) ("[N]either party waives the right to a full trial on the merits by filing its own motion.").  "However, when cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "'may be probative of the non-existence of a factual dispute."  *Syncrude Canada Ltd. v. Highland Consulting Group, Inc.*, 916 F. Supp. 2d 620 (D. Md. 2013) (quoting *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983)); *Georgia State Conference of NAACP v. Fayette County Bd. of Comm'rs,* 775 F.3d 1336, 1345 (11th Cir. 2015).

## ANALYSIS

## I.    Declaratory Judgment Claim (Count One)

Fish has moved for summary judgment as to his declaratory judgment claim. Fish argues that this Court should declare that Cincinnati must either fully repair his boat or pay him for the entire loss in accordance with the Policy. The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes a district court to "declare the rights and other legal relations of any interested party seeking such declaration." The United States Court of Appeals for the Fourth Circuit has "frequently approved the use of declaratory judgment actions to resolve disputes over liability insurance coverage." *Nautilus Ins. Co. v. Winchester Homes*, 15 F.3d 371, 375-76 (4th Cir. 1994). As Judge Hazel of this Court, building on the analysis of Judge Hollander, has previously noted,

> The Policy at issue here is a marine insurance policy subject to the Court's admiralty jurisdiction. *See United States v. Tug Marine Venture*, 101 F. Supp. 2d 378, 381 (D. Md. 2000). When interpreting marine insurance policies, state law applies unless (1) a federal statute speaks to the question or (2) there is an

11

> applicable judicially-created admiralty rule. *Nat'l Liab. & Fire Ins. Co. v. Rooding*,
> No. CV ELH-15-2572, 2017 U.S. Dist. LEXIS 8636, 2017 WL 281994, at *6
> (D. Md. Jan. 23, 2017) (citing *Wilburn Boat Co v. Fireman's Fund Ins. Co.*, 348 U.S.
> 310, 313-14 (1955)).

*GEICO Marine Ins. Co. v. Carnes*, No. GJH-19-1457, 2021 U.S. Dist. LEXIS 3865, at *6 (D.

Md. Jan. 8, 2021). The parties have identified no specific and controlling federal rule.

Accordingly, Maryland law applies.[5] Where the insured asserts entitlement to coverage under

an insurance policy, that party bears the burden of proving coverage. *See Prop. & Cas. Ins.*

*Guar. Corp. v. Beebe-Lee*, 431 Md. 474, 66 A.3d 615, 624 (Md. 2013). "If the insured meets its

burden and the 'insurer [has] relie[d] upon a policy exclusion to deny coverage, the insurer

bears the burden of proving that the exclusion applies.'" *Id.* (quoting *Ellicott City Cable, LLC*

*v. Axis Ins. Co.*, 196 F. Supp. 3d 577, 584 (D. Md. 2016) (citing *Finci v. Am. Cas. Co.*, 323 Md.

358, 593 A.2d 1069, 1087 (Md. 1991)).

The parties agree that the language of the contract is clear and unambiguous.

(Cincinnati Reply, ECF No. 83 at 16; ECF No. 84 at 2 n.2.) Cincinnati agrees that "Fish

[has] satisfied his burden of production so as to potentially trigger the insuring language of

his policy, i.e., that he sustained physical loss to covered property." (Cincinnati Reply, ECF

No. 83 at 7.) The parties dispute whether Cincinnati has met its burden production to show

the applicability of the Policy's wear and tear exclusion and requirement that Fish cooperate

---

[5] Fish appears to argue that federal maritime law governs the burden of proof in a marine insurance contract dispute. For that proposition, Fish cites an unpublished decision of the Eleventh Circuit in which the Court specifically declined to decide that issue because Florida law was not materially different from federal law with respect to the question of the controlling burden of proof. *See Lamadrid v. Nat'l Union Fire Ins. Co.*, 567 F. App'x 695, 700 (11th Cir. 2014). In this case, Fish concedes that Maryland law imposes the same burden of proof as federal maritime law in an insurance coverage case. (Fish Reply, ECF No. 84 at 2 n.1.) Therefore, this Court will apply Maryland law.

with the investigation of the claim. Cincinnati points to several facts to support its contention that the wear and tear exclusion applies. For example, Cincinnati argues that its "surveyors with Davis concurred that the Boat's exterior damage is consistent with damages that could have resulted from the storm, but that the interior water and mold damage is consistent with a lack of maintenance over time." (ECF No. 83 at 7; ECF No. 80-14 at 3; ECF No. 80-15.) Cincinnati also argues that Davis' opinions were consistent with Fish's own annotations in pictures he provided which noted that the interior water damage was the result of decayed window sealant. (ECF No. 83 at 7; ECF No. 80-17 at 17, 20, 27, 28.) Cincinnati further points to the testimony of Fish's marine consultant McCook that the mold displayed in Fish's photos could not have formed in one day. (McCook Dep., ECF No. 80-13 at 175-177.) Finally, Cincinnati argues that Fish has come forward with no evidence to support his hypothesis that the loss was caused by a leaking conduit rather than poorly maintained window sealant. (ECF No. 83 at 7.)

Fish, on the other hand, argues that Cincinnati has not met its burden to establish the applicability of the wear and tear exception because Cincinnati's own experts cannot determine with certainty how the interior of the boat sustained water damage. (ECF No. 84 at 4; McDaniel Dep., ECF No. 82-13 at 104, 108.) The record clearly reflects the existence of a factual dispute as to the origin of the interior water and mold damage that is material to question of the applicability of the wear and tear exception.[6] In reviewing a motion for

---

[6] With respect to Cincinnati's argument that Fish violated the Policy's provision requiring him to cooperate in the investigation of the claim, the record similarly reflects the existence of material disputes of fact. While Fish concedes that "it would be fair to characterize [his] initial correspondence with Lambrecht as sluggish," he argues that lack of cooperation was not an exclusion upon which Cincinnati relied when initially denying his claim. (ECF No. 84 at 5.) Fish also argues that he did not change his theory of the loss nor did he refuse inspections, change the location of an inspection at the last minute or unreasonably refuse inspections. (*Id.*)

summary judgment, this Court "cannot weigh the evidence or make credibility determinations." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015). Accordingly, Fish's Motion for Summary Judgment as to his claim for declaratory judgment is DENIED.

## II.    Breach of Contract Claim (Count Two)

For the same reason Fish is not entitled to summary judgment on his claim for declaratory judgment, he is not entitled to summary judgment on his breach of contract claim. In Maryland, the elements of a claim for breach of contract are "'contractual obligation, breach, and damages.'" *Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 307 (4th Cir. 2020) (quoting *Kumar v. Dhanda*, 198 Md. App. 337, 344, 17 A.3d 744, 749 (2011)). As stated above, the factual disputes in this case center around whether Cincinnati breached its contractual obligations to Fish when it denied coverage for damage to the interior of Fish's boat. "[I]f there clearly exist factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party, then summary judgment is inappropriate." *Pitter v. Cmty. Imaging Partners, Inc.*, 735 F. Supp. 2d 379, 389 (D. Md. 2010). The applicability of the wear and tear exception will be for the finder of fact to determine. Accordingly, Fish's Motion for Summary Judgment as to his breach of contract claim is DENIED.

---

As Cincinnati has noted, "in the face of conflicting evidence on these issues, it will be for Cincinnati to satisfy its burden of persuasion to the fact finder." (ECF No. 83 at 9.)

### III.   First-Party Lack of Good Faith Claim (Count Three)

Both Cincinnati and Fish have moved for summary judgment on Fish's first-party

lack of good faith claim. As Judge Gallagher of this Court has noted,

> Maryland does not recognize a tort action against an insurer for bad faith failure
> to pay an insurance claim. *See Johnson v. Kemper Inc. Co.*, 74 Md. App. 243, 248,
> 536 A.2d 1211, 1212 (1988), cert. denied, 313 Md. 8, 313 Md. 7, 542 A.2d 844
> (Table) (1988); *see McCauley v. Suls*, 123 Md. App. 179, 187, 716 A.2d 1129, 1133
> (1998); *see also Cecilia Schwaber Trust Two v. Hartford Acc. & Indem. Co.*, 636
> F.Supp.2d 481, 486 (D. Md. 2009); *Allstate Indem. Co. v. Parsons*, JKB-09-3411,
> 2010 U.S. Dist. LEXIS 52691, at *3 (D. Md. May 26, 2010) ("'Bad faith' denial
> of an insurance claim is not a basis for a tort claim in Maryland by a first-party
> claimant against an insurer."); *Ming-Lewis v. Std. Fire Ins. Co.*, CCB-05-1412, 2005
> U.S. Dist. LEXIS 16688, at *2 (D. Md. Aug. 10, 2005) ("[T]here is no tort action
> for the bad faith failure of an insurer to pay a first party claim."); *Snyder v. Chester
> County Mut. Ins. Co.*, 264 F.Supp.2d 332, 340 (D. Md. 2003) ("An insured may
> not bring a bad faith claim against an insurer for refusal to perform under a
> contract."). It does, however, provide a statutory cause of action for failure to
> act in good faith in denying insurance coverage, under C.J. § 3-1701 and its
> companion, Ins. § 27-1001. *See* 2007 Md. Laws, ch. 150. Those statutes require
> an insurer to make "an informed judgment based on honesty and diligence
> supported by evidence the insurer knew or should have known at the time the
> insurer made a decision on a claim." C.J. § 3-1701(a)(5); Ins. § 27-1001(a) (same).

*Schwartz v. Travelers Prop. Cas. Ins. Co.*, No. SAG-20-1919, 2021 U.S. Dist. LEXIS 52260, at

*6-7 (D. Md. Mar. 19, 2021).

Judges in this district apply the "totality of the circumstances" test first articulated in

*Cecilia Schwaber*, 636 F.Supp.2d at 486-87 when assessing first-party lack of good faith claims

under § 3-1701. That test includes the following factors:

> (1) efforts or measures taken by the insurer to resolve the coverage dispute
> promptly or in such a way as to limit any potential prejudice to the insureds; (2)
> the substance of the coverage dispute or the weight of legal authority on the
> coverage issue; [and] (3) the insurer's diligence and thoroughness in
> investigating the facts specifically pertinent to coverage.

*Schwartz v. Travelers Prop. Cas. Ins. Co.*, No. SAG-20-1919, 2021 U.S. Dist. LEXIS 52260, at
*7-8 (D. Md. Mar. 19, 2021) (citing *Barry v. Nationwide Mut. Ins. Co.*, 298 F. Supp. 3d 826, 830
(D. Md. 2018)). "To assess those factors, courts consider the insurer's efforts to obtain
information related to the loss, accurately and honestly assess this information, and support
its conclusion regarding coverage with evidence obtained or reasonably available.
Significantly, the determination as to good faith focuses on the time at which the insurer's
decision was made, not at a later point in subsequent litigation when all involved have the
benefit of additional evidence." *Schwartz v. Travelers Prop. Cas. Ins. Co.*, No. SAG-20-1919,
2021 U.S. Dist. LEXIS 52260, at *7-8 (D. Md. Mar. 19, 2021) (citations omitted). The record
is clear that Cincinnati acted in good faith in denying Fish's claim as to the interior damage
to the boat. First, the record reflects that between August 2017 and May 2018, Lambrecht
wrote to Fish on no fewer than 11 occasions and called him at least 7 times to request that
he provide information in support of his claim. (Email Correspondence, ECF No. 80-8;
Claim Log Notes, ECF No. 80-6.) Only after Lambrecht wrote to Fish to articulate
Cincinnati's intent to close its file due to Fish's failure to communicate regarding his claim
did Fish begin to engage in the claims adjustment process. (July 27, 2018 Email, ECF No.
80-10.)

Having received an estimate from Fish for the cost of repairs that exceeded the value
of the boat, Cincinnati retained its own surveyors at Davis & Co. (Jarrett Bay Estimate, ECF
No. 80-12.) Douglas McDaniel from Davis & Co. provided Cincinnati with his opinion that
while the exterior damage to the boat was consistent with storm damage, "after viewing the
photos provided by Mr. Fish, the water and mold damage is consistent with a lack of

16

maintenance over time." (McDaniel Report, ECF No. 80-14.) Accordingly, Cincinnati paid Fish $18,625.00 for the "wind and hail portion of [his] claim" and "den[ied] coverage for the water and mold portion" of the claim. (Nov. 17, 2018 Letter, ECF No. 80-18.[7]) Four months later, on March 29, 2019, Fish indicated his dissatisfaction with Cincinnati's adjustment of the claim. (Letter, ECF No. 80-19.) Eventually, Cincinnati submitted the disputed value of the exterior portion of the loss to appraisal and paid Fish an additional $24,652.00. (Midatlantic Marine Consultants Report, ECF No. 80-31.) Moreover, when pressed at his deposition to specify the basis of his allegations of bad faith, Fish was unable to name a single action by Cincinnati that demonstrated that it failed to make "an informed judgment based on honesty and diligence supported by evidence the insurer knew or should have known at the time the insurer made a decision on a claim" as required by § 3-1701(a)(5).

  In support of his claim of first-party bad faith, Fish argues that Cincinnati did not examine the boat's electrical systems or conduit. Cincinnati concedes that Fish did bring potential electrical problems to its attention as early as July 28, 2017 but notes that Fish failed to provide further information until October 11, 2017, two and a half months after the loss. Rather than promptly take the boat for an inspection, the record shows that Fish continued to use the boat because he "hadn't had a chance to get [the] yacht in yet as he still wanted to use it for the rest of the summer and he was afraid once he took it in, [the] boat yard would start with repairs." (Claim Log, ECF No. 80-6 at 5.) Indeed, Fish continued to

---

[7] The parties agree that the letter communicating Cincinnati's decision on Fish's claim bears the incorrect year. The letter dates from 2018, not 2016.

use the boat for over a year after the loss before he submitted the estimate from Jarrett Bay. (*Id.* at 8.) The record also reflects that after Fish's expert Michael McCook again raised the issue of potential electrical problems, Cincinnati engaged engineer Michael Pinion to inspect the boat. Pinion ultimately concluded that "the reported damage to the various electrical equipment is not associated with a storm power surge from shore power." (Pinion Report, ECF No. 80-29 at 5.) Finally, the record shows that the Maryland Insurance Administration issued an opinion finding that Fish "failed to prove by the preponderance of the evidence that [Cincinnati] failed to make an informed judgment based on honesty and diligence supported by the totality of the evidence at the time it made its decision." (MIA Opinion, ECF No. 80-32 at 25.)

The evidence in the record reflects the absence of any material dispute of fact as to each of the *Cecilia Schwaber* factors. First, the record shows that Cincinnati undertook serious efforts to resolve the coverage dispute with Fish's input. Second, given the parties' agreement that the terms of the Policy are clear and unambiguous and in light of the MIA's determination in favor of Cincinnati, there is no question that both the substance of the dispute and the weight of legal authority show that Cincinnati processed Fish's claim in good faith. Third, the record shows that Cincinnati was diligent in its investigation and responsive to Fish's concerns about the possibility of electric damage. Fish simply has not offered sufficient evidence from which a trier of fact could conclude that Cincinnati did not operate in good faith in processing his claim. As Judge Gallagher has noted, "the fact that . . . [Fish is] unable to persuade the insurer to change its mind does not mean that the insurer failed to act in good faith." *Schwartz v. Travelers Prop. Cas. Ins. Co.*, No. SAG-20-1919, 2021 U.S. Dist.

LEXIS 52260, at *9 (D. Md. Mar. 19, 2021). Accordingly, Fish's Motion for Summary

Judgment as to his first-party lack of good faith claim is DENIED, and Cincinnati's Motion

for Summary Judgment as to that claim is GRANTED.

## IV.   Unfair Claim Settlement Practices Claims (Counts Four, Six, Seven, and Eight)

Likewise, Cincinnati is entitled to summary judgment as to Fish's unfair claim

settlement practices claims. As Judge Chuang of this Court has noted,

> The Unfair Claim Settlement Practices Act prohibits an insurer from failing to act in good faith solely with respect to settling first-party claims. Md. Code Ann., Ins. § 27-303(9). Furthermore, the statute provides for *only administrative remedies*, to be received through the Maryland Insurance Administration ("MIA"). Md. Code Ann., Ins. § 27-301; *Hartz v. Liberty Mut. Ins. Co.*, 269 F.3d 474, 475-76 (4th Cir. 2001) ("[F]ederal courts simply have no license to upend Maryland's decision to resolve this sort of insurance complaint administratively.").

*Moye v. Avis Budget Grp.*, Civil Action No. TDC-14-2714, 2015 U.S. Dist. LEXIS 11204, at

*7-8 (D. Md. Jan. 27, 2015) (emphasis added). Fish argues that his claims in Counts Four,

Six, Seven, and Eight are in substance appeals of the MIA's adverse decision that the parties

agreed to resolve outside of the administrative process. Fish cites no authority for the

proposition that this Court has jurisdiction over such an appeal. In the face of clear Fourth

Circuit precedent, Fish asks this Court to subvert the decision of the Maryland legislature to

leave such disputes to the administrative process. This Court will not do so. Accordingly,

Fish's unfair settlement practices claims fail as a matter of law. Fish's Motion for Summary

Judgment as to these claims is DENIED, and Cincinnati's Motion is GRANTED as to

Counts Four, Six, Seven, and Eight.

## V.     Breach of Implied Covenant of Good Faith and Fair Dealing (Count Eight*)

Fish concedes that Cincinnati is entitled to judgment on this Count because Maryland law does not recognize a standalone cause of action for breach of the implied covenant of good faith and fair dealing. *See* ECF No. 84 at 17-18; *see also Marland v. Safeway, Inc.*, 65 F. App'x 442, 449 (4th Cir. 2003); *Arashteh v. Mount Vernon Fire Ins. Co.*, No. WDQ-13-2833, 2014 U.S. Dist. LEXIS 111538, at *7-8 (D. Md. Aug. 12, 2014). Accordingly, Cincinnati's Motion for Summary Judgment is GRANTED as to Count Eight*.

## VI.     Damages

For the reasons stated above, this case will proceed as to Cincinnati's sole claim for declaratory relief as well as Fish's two remaining claims for declaratory relief and breach of contract.[8] In their summary judgment submissions, the parties raise a number of issues regarding potential damages to be determined in this case by the trier of fact. Cincinnati argues that even assuming that a fact finder determines that that there was coverage under the Policy for the interior damage to Fish's boat, Fish has offered no evidence to challenge Cincinnati's estimate of that damage. Cincinnati argues that such damages should be limited to $32,075.00, the amount of interior damage Davis calculated in November 2018. (ECF No. 80-14 at 5.) Cincinnati also argues that Fish has offered no admissible calculation as to the

---

[8] "A litigant's right to a jury trial of legal issues [cannot] be lost through prior determination of equitable claims. . . . [I]n the absence of irreparable harm to the plaintiff seeking equitable relief, the legal issues should be tried to a jury before the court rule[s] on equitable claims." *Minn. Lawyers Mut. Ins. Co. v. Batzli*, Civil Action No. 3:09CV432-HEH, 2009 U.S. Dist. LEXIS 119751, at *2 (E.D. Va. Dec. 22, 2009), *aff'd, Minn. Lawyers Mut. Ins. Co. v. Batzli*, 442 F. App'x 40 (4th Cir. 2011) (citing *Terry v. Chauffeurs, Teamsters & Helpers*, 863 F.2d 334, 336 (4th Cir. 1988)). Accordingly, to the extent the parties assert their right to a jury trial on Fish's breach of contract claim, this Court will await the jury's verdict before deciding the matter of the competing claims for declaratory judgment.

extent of his damages apart from the answers in two sets of interrogatories, one of which was provided on the date of Fish's deposition, that do not adequately demonstrate how the damages figures were calculated. (ECF No. 80-33 at 11-13; ECF No. 80-34 at 6.) Cincinnati further points to Fish's failure to elaborate on his demand for damages at his deposition as a reason to limit his potential damages. (ECF No. 80-35 at 14.)

Cincinnati also asserts that the only support in the record for Fish's damages figure comes from McCook's belated expert opinion first disclosed at his deposition on May 13, 2021, the day before the close of discovery in this case. McCook stated in his deposition that his "scientific wild ass guess" was that it would take somewhere between $150,000 and $170,000 to restore Fish's boat its pre-loss condition. (McCook Dep., ECF No. 80-13 at 239-240.) Cincinnati argues that this Court should preclude McCook from testifying as to damages because Fish's initial Rule 26(a)(2) disclosure for McCook in June 2020 did not indicate that McCook would opine on damages. (ECF No. 80-26.) Instead, on May 15, 2021, the day *after* the close of discovery, Fish supplied a belated amended expert witness designation for McCook in which he disclosed that McCook would opine on "the types and amount of damages sustained by Mr. Fish." (ECF No. 80-37 at 3.) The amended designation was accompanied by a supplemental report in which McCook refined his "scientific wild ass guess" to estimate the cost of repairs at $174,658.81. (*Id.* at 5.) Fish offers no substantive defense of his untimely disclosure of McCook's amended designation and opinions with respect to damages.

As Chief Judge Bredar has noted,

The remedy for a failure to disclose is governed by Federal Rule of Civil Procedure 37(c)(1), which provides that "[i]f a party fails to provide information

or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." In determining whether a failure to disclose is substantially justified or harmless, "a district court should be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence." *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014) (quoting *S. States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596-97 (4th Cir. 2003)).

*Garrity v. Metro. Sec. Servs.*, No. JKB-21-1453, 2022 U.S. Dist. LEXIS 18671, at *4-5 (D. Md. Jan. 31, 2022). In this case, Fish's failure to disclose was neither justified nor harmless. First, despite having asked for clarification as to Fish's position on damages, Cincinnati received no itemized breakdown until McCook's deposition, on the eve of the close of discovery. Moreover, Fish did not disclose until after McCook's deposition that McCook would opine on damages. Second, given that discovery had concluded by the time Fish provided McCook's amended designation, Cincinnati was not in a position to cure the surprise. Third, the evidence of McCook's calculation would disrupt schedule in this case because although there is no trial date set, this Court would need to permit Cincinnati additional time for discovery to cure the surprise. Fourth, the evidence is important, for damages are a necessary element of a Maryland breach of contract claim. Finally, Fish has offered no explanation at all for his failure to disclose. Accordingly, Fish will be precluded from offering any testimony from McCook as to the amount of damages in this case.

This Court also notes that Fish has claimed $700,000.00 in damages due to "lack of good faith, including non-statutory, tortious interference claim." (ECF No. 80-34 at 6.)

There is no basis for that claim to be put to the trier of fact.[9] First, "[i]t is well established in Maryland that punitive damages cannot be awarded in a pure breach of contract case, although they are recoverable in tort actions arising out of contractual relationships where actual malice is present." *Banca Popolare di Novara v. Mfrs. & Traders Tr. Co.*, Civil Action No. ELH-11-736, 2011 U.S. Dist. LEXIS 96101, at *32 (D. Md. Aug. 26, 2011) (citing *Sims v. Ryland Group, Inc.*, 37 Md. App. 470, 475, 378 A.2d 1, 4 (1997)). Second, Fish has not alleged a claim against Cincinnati for tortious interference, nor has Fish alleged that Cincinnati acted with malice. Third, the Policy does not contain a liquidated damages clause. Accordingly, the claim for $700,000.00 in lack of good faith damages will not be presented to the trier of fact in this case. This case will proceed to trial with respect to the determination of any further damages claimed by Fish.

## CONCLUSION

For the reasons stated above, Fish's Motion for Summary Judgment (ECF No. 82) is DENIED, and Cincinnati's Partial Motion for Summary Judgment (ECF No. 80) is GRANTED with respect to Counts Three through Eight* of Fish's Amended Counterclaim. This case shall proceed as to Cincinnati's sole claim for declaratory judgment and Fish's two remaining claims for declaratory judgment and breach of contract.

A separate Order follows.

Dated: February 24, 2022

---

[9] As noted above, Fish's first-party lack of good faith and unfair claim settlement practices claims will not move forward.

_____/s/_____

Richard D. Bennett
United States District Judge